IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DERIL L. NASH                                                    PLAINTIFF

            v.                        Civil No. 05-5023

SHERIFF FERGUSON; CAPTAIN
HUNTER PETRAY; SGT. CLIFFORD;
DR. NEIL MULLINS; NURSE SUE
McDONALD; FABRIAN RUTHERFORD; and
JAMES CRABTREE                                                  DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Deril Nash brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. While he was incarcerated at the Benton County Detention Center, Nash contends his federal constitutional rights were violated in a number of ways.

On December 27, 2005, defendants filed a motion for summary judgment (Doc. 29). On February 9, 2006, the undersigned entered an order (Doc. 32) directing the plaintiff to complete, sign and return an attached questionnaire that would serve as his response to the motion for summary judgment. On March 2, 2006, plaintiff's response to the court's questionnaire (Doc. 33) was filed. The case is currently before the undersigned for the issuance of a report and recommendation on the summary judgment motion.

## I. BACKGROUND

Nash was arrested and booked into the Benton County Detention Center (BCDC) on February 14, 2002, on charges of sexual assault, rape, the use of a child in sexual performances, pandering, and media charges. *Plaintiff's Response* (Doc. 33) (hereinafter *Resp.*) at ¶ 1. He was initially incarcerated solely because of the pending criminal charges. *Id.* at ¶ 2.

-1-

On April 23, 2004, Nash was convicted. *Resp.* at ¶ 4. He remained at the BCDC until he was transported to the Arkansas Department of Correction (ADC) on June 15, 2004. *Id.* at ¶ 3.

On July 26, 2002, Nash asked to go to the law library. *Resp.* at ¶ 5. Although defendants' records indicate Nash had access to the library from 4:15 p.m. until 7:47 p.m., *see defendants' exhibit* 2 at page 9, Nash contends he only had access for one hour and thirty minutes. *Resp.* at ¶ 6. Additionally, Nash indicates another inmate, Robert Sparkman, was using the library. *Id.*

On August 27, 2002, Nash asked to go to the law library. *Resp.* at ¶ 7. When Nash started to take all the books into his cell, he was told some of the books were copies. *Id.* at ¶ 8. At that point, Nash asserts he went through the books and picked out one of each. *Id.*

According to Nash, the officer would not allow him to look through every law book to find what he needed. *Defts' Ex.* 2 at page 11. Nash maintains this denied him the proper use of the library cart. *Id.* Additionally, Nash states another inmate had some of the books in a holding cell. *Id.* In response, Nash was told he was not denied the opportunity to use the law library. *Id.* He was told there are several books on there that were copies and he did not need all copies of law books. *Id.*

Nash asserts he was told he could only take one book. *Resp.* at ¶ 11 & *Defts' Ex.* 2 at p. 12. In response, Nash was told he did not need every book. *Defts' Ex.* 2 at p. 12. Nash was told he could have one of each book but continued taking more than he could carry. *Id.* at p. 13. Nash refused and was denied access to the law library until he could treat it with respect. *Id.*

AO72A
(Rev. 8/82)

On August 8, 2002, Nash submitted a medical request stating that he had been waking up with blood in his mouth for the past three days and spitting up blood all day long. *Resp.* at ¶ 12(A). This is the first medical request he submitted about bleeding in his mouth or gums. *Id.* at ¶ 12(B). In response, Nash was told he would be seen by the nurse. *Id.* at ¶ 12(C).

Nash was seen by Nurse McDonald on August 9, 2002. *Defts' Ex.* 3(b) at page 1. She told him to massage him gums and indicated he had periodontal disease. *Id.*

On August 9, 2002, Nash submitted a grievance stating that he was bleeding in the mouth and when he saw the nurse she said he had gum disease and the nurse said there was nothing they could do for him. *Defts' Ex.* 2 at page 15. He asked for a second opinion. *Id.* In response, he was told the doctor makes all medical decisions. *Id.*

On August 23, 2002, Nash submitted a medical request about his bleeding gums. *Resp.* at ¶ 14(A). He stated his gums had been bleeding day and night for the past three weeks. *Id.* He stated he wanted to see the doctor-- not the nurse-- about the problem. *Id.*

In response, Nurse McDonald told Nash that he had neglected his teeth and had periodontal disease. *Resp.* at ¶ 14(B). She stated the gums would always bleed until his teeth fell out. *Id.* She told him to massage his gums and that was all they could do for him. *Id.* She stated total neglect caused this over a period of years. *Id.* According to Nash, prior to his incarceration, he had never had problems with his gums bleeding. *Id.* at ¶ 16.

On December 29, 2002, Nash submitted a grievance about his broken glasses. *Resp.* at ¶ 17. He stated the guards took his glasses at booking and told him that he would not get them back until he was released. *Id.* He indicated another guard told an inmate that his glasses were

-3-

broken.  *Id.*  He stated he wanted to know what could be done to replace his prescription glasses. *Id.*

In response, Nash was informed that his glasses had fishing string on them.  *Resp.* at ¶ 18.  He was told this was not allowed in the cells so his glasses were put in his property.  *Id.*

His glasses were for reading and for distance.  *Resp.* at ¶ 19.  There was fishing string on the left side of the glasses because the screw was stripped out.  *Id.* at ¶ 20.  Nash indicates he had no had time to get the glasses repaired prior to his arrest.  *Id.*  According to Nash, he had his glasses from the time of his arrest until December 29, 2002.  *Resp.* at ¶ 18 & ¶ 21.

On December 29, 2002, Nash submitted a grievance about being abused by guards.  *Resp.* at ¶ 22.  He indicated the whole pod was told to line up on the top tier for chow.  *Id.*  He stated he refused to go without a good reason for it.  *Id.*

Nash indicated the guards did not give a good reason for the inmates having to line up on the top tier.  *Resp.* at ¶ 23.  He stated he was told to toss out his mat and blanket and he complied.  *Id.*  He then asked for a grievance and asked to see the captain.  *Id.*

Nash kept pushing the call button in his cell asking to see the captain.  *Resp.* at ¶ 24(A). Nash asserts he was pushed and shoved all the way to booking.  *Id.*  He also states this was when his glasses were taken from him and he was told he could not get them until he was released. *Id.*

Nash indicates Sgt. Crabtree and another deputy were involved in the incident.  *Resp.* at ¶ 24(B).  If Nash was injured as a result of the use of force, he was asked to describe in detail those injuries.  *Id.*  Nash did not indicate he was injured or describe any injuries.  *Id.*

In response to Nash's grievance, he was informed that inmates were not abused at the facility. *Resp.* at ¶ 25. He was informed that all inmates would obey the deputies' orders and follow jail rules. *Id.*

On December 30, 2002, Nash submitted a grievance regarding medical problems. *Resp.* at ¶ 26. He indicated he had asked the nurse for an appointment with the doctor and the nurse had admitted that his condition and ongoing symptoms were beyond her expertise. *Id.* He asked that the doctor be allowed to examine him and determine if his condition could be cured or assisted. *Id.* In response, Nash was told he had seen the jail medical staff and they made all medical decisions. *Id.* at ¶ 27.

On January 6, 2003, Nash submitted a grievance about bleeding gums and foot fungus. *Resp.* at ¶ 28. He indicated he had asked to be seen by the doctor. *Id.* He stated he had been told that the nurse said there was nothing that she could do for him except massage his gums and that his teeth would eventually fall out. *Id.* He stated his mouth had been bleeding for over eight months and he wanted to see a doctor for a second opinion on his gums and foot problem. *Id.* In response, Nash was informed his request would be forwarded to the medical staff. *Id.* at ¶ 29.

Nash was seen by Dr. Mullins on January 8, 2003. *Defts' Ex.* 3(b) at page 1. He was complaining of bleeding in his mouth. *Id.* Nash was told to gargle with salt water. *Id.*

Nash did not submit another medical request regarding his bleeding gums until February 19, 2003. *Resp.* at ¶ 15(D). He indicated he needed a salt water rinse to help stop his gums from bleeding. *Id.* at ¶ 30. In response, Nash was seen by Nurse McDonald on February 21, 2003. *Defts' Ex.* 3(b) at page 1. She prescribed salt water gargles, twice a day, for four days. *Id.*

AO72A
(Rev. 8/82)

On April 2, 2003, Nash submitted a medical request in which he stated his gums and teeth were bleeding badly again and he wanted to see the nurse about getting a hot salt water rinse. *Resp.* at ¶ 32. He also indicated he was having pain in his right shoulder and needed Aspirin for the pain. *Id.* Nash was seen by Nurse McDonald on April 4, 2003, and prescribed salt water gargles, twice a day, for five days, and Aspirin. *Resp.* at ¶ 33.

On April 6, 2003, Nash submitted another medical request to see the nurse. *Resp.* at ¶ 35. He stated that he had been receiving a cold salt water rinse and it was not doing any good. *Id.*

In response, Nash was told that it would be changed to a hot water rinse. *Resp.* at ¶ 35. He did receive a hot water salt rinse after this. *Id.* at ¶ 36.

On April 14, 2003, Nash submitted a medical request stating that he needed to see the doctor to have his eyes checked so it could be verified that he needed glasses. *Resp.* at ¶ 37. In response, Nash was seen by the nurse on April 15, 2003. *Defs' Ex.* 3(b) at page 1. A note was made about Nash stating he needed an eye examination. *Id.* Nash was also prescribed salt water gargles. *Id.*

On April 18, 2003, Nash requested a stronger salt water rinse. *Resp.* at ¶ 39(A). He asked that ten packets of salt be used instead of five. *Id.* In response, the nurse okayed the use of eight packets of salt in each rinse. *Id.* at ¶ 39(B).

On April 22, 2003, Nash submitted another medical request regarding his bleeding gums. *Resp.* at ¶ 40. He stated he needed hot water salt rinses. *Id.*

On April 24, 2003, Nurse McDonald saw Nash and noted that he had a loose tooth. *Defs' Ex.* 3(b) at page 1. She prescribed salt water gargles, twice a day, for four days. *Id.* On

-6-

April 28, 2003, Nash was seen by Dr. Mullins. *Id.* at page 3. He noted Nash had a loose tooth and put Nash on an antibiotic and Ibuprofen. *Id.*

On May 25, 2003, Nash submitted a grievance stating that he had bad eyes and needed new glasses. *Resp.* at ¶ 42; *Defts' Ex.* 2 at page 31. He stated the nurse had told him that the medical staff did not make decisions concerning eye glasses and that he needed to have an eye examination set up and he would be transported there. *Id.* Nash indicated his pastor had been trying to get it okayed by Captain Petray and he kept refusing to allow it. *Id.* Nash wanted to know why Captain Petray was not allowing the examination. *Id.*

In response, Captain Petray told Nash that chaplains were not allowed to get personally involved with inmates. *Resp.* at ¶ 43. Nash was told the chaplains come in to preach the word and that is it. *Id.*

On May 27, 2003, Major Drake also responded to Nash's grievance. *Resp.* at ¶ 44. Major Drake stated that Nash came into the jail with his glasses broken and tied together with fishing line. *Id.* He indicated the fishing line was removed for the safety and security of the jail. *Id.* Major Drake stated he understood a new pair had been brought in for Nash and that he was now wearing those glasses. *Id.* Nash indicates the glasses were not new. *Id.* Instead, he states his lenses were put into an old frame. *Id.*

On May 26, 2003, Nash submitted a medical request stating that his mouth was bleeding badly and he needed the dentist to pull his teeth and get dentures. *Resp.* at ¶ 47. Nurse McDonald noted that Nash wanted his teeth pulled and a complete set of dentures. *Defts' Ex.* 3(b) at page 3. She stated Nash's teeth were rotten and had been in that condition for years. *Id.* She indicated he had periodontal disease. *Id.*

AO72A
(Rev. 8/82)

According to Nash, his teeth were not rotten. *Resp.* at ¶ 47(B). In his opinion, the teeth he had left were in good shape. *Id.* Nash maintains he told both the doctor and the nurse that he needed his teeth pulled but they would not do it. *Id.* Instead, Nash indicates he was told to go to Oklahoma to have it done. *Id.*

On May 27, 2003, Nash's tooth was pulled by a dentist in Bentonville. *Resp.* at ¶ 41(C). On May 28, 2003, Nash submitted a medical request asking what happened to his hot salt water rinses and the pain medication the nurse had said he would get for his bleeding gums and right shoulder pain. *Id.* at ¶ 45. In response, the nurse wrote that she gave Nash salt water rinses. *Id.* at ¶ 46.

On May 30, 2003, Nash submitted another medical request indicating that he had gotten the hot salt water rinses for his bleeding gums. *Defts' Ex.* 3(a) at page 18. However, he stated he still had not gotten anything for the pain in his right shoulder. *Id.*

On June 22, 2003, Nash submitted a medical request in which he stated, among other things, that his mouth was still bleeding badly. *Resp.* at ¶ 50. In response, he was told he would be seen by the doctor on Wednesday. *Id.*

On July 28, 2003, Nash submitted a medical request in which he stated, among other things, that he needed to see a dentist over a bad tooth and bleeding gums. *Defts' Ex.* 3(a) at page 21. He also complained about high blood pressure. *Id. See also Resp.* at ¶ 52. He was seen by the nurse that same day and his blood pressure checked. *Resp.* at ¶ 53(B).

On July 29, 2003, Nash submitted a medical request in which he stated, among other things, that his mouth was still bleeding and had been bleeding for over a year. *Resp.* at ¶ 54. Nash stated he needed to see a dentist and have something done about his bleeding mouth. *Id.*

-8-

On July 31, 2003, Nash submitted a medical request in which he stated, among other things, that he needed something for his bleeding gums. *Resp.* at ¶ 56. In response, Nash believes he was seen by the doctor on July 30th or July 31st. *Resp.* at ¶ 55(B) & ¶ 57(A). However, he cannot recall the results of the visit. *Id.* at ¶ 55(B).

On August 1, 2003, Nash submitted a medical request in which he stated, among other things, that his mouth had been bleeding badly for the past year and a half. *Resp.* at ¶ 58. He asked when something would be done for it. *Id.* In response, Nash was told he would be seen by the nurse. *Id.* at ¶ 59(A). However, Nash does not recall if he was seen by the nurse and he notes that if he was it should be recorded on their medical records. *Id.* at ¶ 59(B).

There is an indication in the records that Nash was seen by the nurse on August 7th and his blood pressure and pulse rate were checked and he was prescribed Tylenol for shoulder pain. *Defts' Ex.* 3(b) at page 2. However, there is no mention of Nash's problems with his gums. *Id.*

On August 15, 2003, Nash submitted a medical request, in which he stated, among other things, that his gums were bleeding. *Resp.* at ¶ 60. Nash submitted a second medical request that same day asking for a soft food tray. *Resp.* at ¶ 62. He stated that he had a gum disease that made his mouth bleed. *Id.* When he tried to eat carrots, celery, or chips, he stated his mouth bled very badly. *Id.* Due to his dental problems, he asked to be put on a soft tray. *Id.*

In response, Nash was seen by Nurse McDonald on August 19th. *Defts' Ex.* 3(b) at 2. His blood pressure was checked. *Id.* He was given hydrocortisone creme for a rash. *Id.* He was also given a soft diet for his teeth. *Id.*

On August 25, 2003, Nash submitted a medical request. *Resp.* at ¶ 64. He stated he was being fed mainly nothing but peanut butter sandwiches two to three times a day. *Id.* He stated

AO72A
(Rev. 8/82)

that was not a healthy diet. *Id.* He asked to be given more nutritional food or put back on normal food. *Id.* In response, he was put back on a normal diet. *Id.*

On November 11, 2003, Nash asked to see a letter or article that was in his property. *Resp.* at ¶ 66(A). He was told he could have access to the item when the property deputy was not busy. *Id.*

On November 13, 2003, Nash submitted a medical request in which he stated he had a tooth that was bothering him and needed to be pulled. *Resp.* at ¶ 66(B). On November 14, 2003, Nash was seen by the nurse who prescribed Acetaminophen tablets, twice a day, for ten days, and she indicated she would set up an appointment for him to be seen by a dentist. *Defts' Ex.* 3(b) at page 2. On November 19, 2003, Nurse McDonald made an appointment for Nash with the dentist for December 12, 2003, at 10:30 a.m. *Id.*

Although defendants records appear to indicate Nash was seen by a dentist on December 12th and a tooth extracted, *defts' ex.* 3(b) at page 2, Nash maintains he was only seen by a dentist once and only had one tooth pulled out. *Resp.* at ¶ 69(A). He believes this occurred on April 24, 2003.[1] *Id.*

On December 15, 2003, Nash was seen by Nurse McDonald and prescribed Ibuprofen and salt water gargles. *Defts' Ex.* 3(b) at page 2. Nash received all medication prescribed by medical personnel. *Resp.* at ¶ 71(A). Nash received all treatment Dr. Mullins and Nurse McDonald ordered. *Id.* at ¶ 71(B).

---

[1]We note that Nash indicated he had a loose tooth pulled on May 27, 2003. *Resp.* at ¶ 41(C).

AO72A
(Rev. 8/82)

On March 18, 2004, Nash asked to have a news clipping from his personal property so his attorney could prepare his case. *Resp.* at ¶ 72(A). In response, Nash was told he had to come up and they would do a property release. *Id.* at ¶ 72(B).

On May 1, 2004, Nash submitted a request. *Resp.* at ¶ 73. He stated his attorney Jeffrey Kearney on April 29, 2004, dropped off some legal mail for him to Sgt. Clifford. *Id.* He indicated he was told he could not have it until the Captain okayed it. *Id.* It had been three days and he stated he did not know why he had not received the mail. *Id.*

In response, Captain Petray indicated Nash's attorney had dropped off a copy of the BCDC policy book. *Defts' Ex.* 2 at page 58. Captain Petray stated the policy book had been placed in Nash's property where it would remain until he left the jail. *Id.*

Nash states he was not present when his legal mail was gone through. *Resp.* at ¶ 74. For this reason, he states he has no idea what the legal mail consisted of. *Id.* at ¶ 75. Nash states as far as he knows the mail could have been court transcripts. *Id.*

On May 2, 2004, Nash submitted a second request asking why he had not received the documents his attorney dropped off for him. *Resp.* at ¶ 76. In response, Captain Petray stated Nash's attorney had dropped off a copy of the BCDC policy and it had been placed in his property. *Id.* at ¶ 77.

Nash received personal mail while at the BCDC. *Resp.* at ¶ 79. However, he contends some of his personal mail was rejected even though it had a "factory" address sticker on it. *Id.* Specifically, he states at least two letters from his Father were sent back. *Id.* He also states a Christmas card from a lady he was corresponding with was sent back. *Id.* at ¶ 80.

-11-

While Nash did not submit a written grievance about not receiving mail from his Father, Nash maintains he did talk to the Major Drake about it. *Resp.* at ¶ 81. Nash asserts Drake made a note and said he would look into it. *Id.*

While at the BCDC, Nash was allowed to have religious materials including a Bible. *Resp.* at ¶ 82(A) & ¶ 82(C). However, he maintains he was denied religious correspondence material and certain materials left at the detention center by his pastor. *Id.* Specifically, he states he was not allowed to receive a correspondence course called Discover which consisted of twenty-six pamphlets. *Id.* at ¶ 82(A). Nash indicates Mike Love tried to leave him some spiritual materials and the guards would not allow him to do so. *Id.*

When he was locked down, Nash maintains he was denied church and access to a pastor. *Resp.* at ¶ 82(B). Nash did not submit a grievances about not receiving religious correspondence material or material the pastor left for him. *Id.* at ¶ 82(D).

The ADC medical records do not indicate Nash complained of bleeding gums. *Defts' Ex.* 4. Nash, however, states he was not held there long enough to fill out a medical regarding this condition. *Resp.* at ¶ 78.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth

-12-

specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

### III. DISCUSSION

Defendants have now moved for summary judgment on each of Nash's claims.

#### *Unexhausted Claims*

In responding to the summary judgment motion, it is clear Nash has not exhausted his administrative remedies with respect to two of his claims. First, Nash contends Fabian Rutherford physically abused him. *Resp.* at ¶ 86. However, Nash states that he did not report the abuse because he was afraid too. *Id.* Second, Nash maintains he was denied access to religious correspondence materials and religious materials left for him by his pastor. *Resp.* at ¶ 82(D). However, Nash did not submit a grievance about being denied access to these materials. *Id.*

As amended by the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section

-13-

1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001). Further, the term "administrative remedies" has been held to encompass remedies not promulgated by an administrative agency. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002). Specifically, it has been held that a grievance procedure contained in a handbook constitutes an available administrative remedy within the meaning of § 1997e(a). *Conception*, 306 F.3d at 1352. When all claims have not been exhausted, the case is subject to dismissal. *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000).

Clearly exhaustion is a prerequisite to asserting a claim. *Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). While dismissal of the case is proper when at least some of the claims are unexhausted, *Graves v. Norris*, 218 F.3d 884, 885-86 (8th Cir. 2000), we believe it is proper, under the circumstances, to dismiss the unexhausted claims rather than the entire case. As the Eighth Circuit has noted, a plaintiff should be given leave to amend his complaint to cure the defect necessitating dismissal. *Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2003). The plaintiff is an incarcerated individual who is proceeding pro se. We will construe his admission that he did not exhaust his remedies on these claims as being a request to dismiss the unexhausted claims. Nash's complaint shall be construed to contain only exhausted claims. *See Thornton v. Phillips County, Ark.*, 240 F.3d 728, 729 (8th Cir.

-14-

2001)(remanding case to the district court for consideration of plaintiff's objections to magistrate judge's report because the objections should have been treated as a motion for leave to amend the complaint).

### Excessive Force

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).

In this case at the time of the alleged use of excessive force, Nash was a pretrial detainee.

In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and

-15-

Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard.").  The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  *Schoemehl*, 878 F.2d at 1048.  The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them.  *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

Applying the applicable law to the facts of this case, the court concludes there are no genuine issues of fact exist as to whether Crabtree and another unidentified deputy used excessive force against Nash.  Nash refused to obey the orders of the guards, *resp.* at ¶ 22, kept pushing the call button, *resp.* at ¶ 24(A), and refused to follow directions.  Although some amount of physical force may have been used to take him to booking, Nash received no injuries. *Resp.* at ¶ 24(B).  *See Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003)("An 'actual injury' must be shown to support an excessive force claim under the Fourth Amendment.")(citation omitted); *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)(A bruised ear lasting three days did not constitute physical injury for purposes of § 1997e(e)); *Warren v. Westchester County Jail*, 106 F. Supp. 2d 559, 569 (S.D.N.Y. 2000)(excessive force claim dismissed where inmate's injuries were no more than *de minimis* and thus insufficient to satisfy § 1997e(e)).  This is fatal to his claim.

### *Denial of Medical or Dental Care*

As Nash was a pretrial detainee during most of the relevant time, his denial of medical care claims are more properly analyzed under the due process clause of the Fourteenth Amendment than the Eighth Amendment.  *Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th

-16-

Cir. 2004). "The standard to be applied in assessing a pretrial detainee's claim of due process violations . . . is not entirely clear." *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 906 (8th Cir. 1999)(citation omitted). Nevertheless, "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (*quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).

In the absence of a clearly binding standard, the Eighth Circuit in analyzing inadequate medical care claims brought by pretrial detainees has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield*, 371 F.3d at 456-457; *Spencer,* 183 F.3d at 905-06; *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d

-17-

413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

-18-

In this case, Nash made repeated requests over a significant period of time, beginning on August 8, 2002, until at least December 15, 2003, for treatment dealing with his bleeding gums and problems with his teeth. *Chance v. Armstrong*, 143 F.3d 698, 702 (2nd Cir. 1998)("Dental conditions, like other medical conditions, may be of varying severity."); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995)(three-week delay in dental treatment aggravated problem); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)(inmate suffered from breaking teeth, bleeding and infected gums, pain and weight loss due to an inability to eat demonstrated a serious dental condition); *Fields v. Gander*, 734 F.2d 1313, 1314-15 (8th Cir. 1984)(severe pain due to infected tooth); *Manney v. Monroe*, 151 F. Supp. 2d 976, 990 (N.D. Ill. 2001)(inmate asserts he suffered from pain, headaches, inability to eat and suffered weight loss due to inability to eat). *Cf. Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001)("[D]ental care is one of the most important medical needs of inmates."). It is clear from Nash's requests and Nurse McDonald's notes that Nash had a serious problem with periodontal disease. Despite this problem, he was not referred to a dentist for treatment and given only the most basic treatment, mainly salt water rinses, although it was clear this treatment did not resolve the problem. While a mere disagreement over the timing and type of dental treatment is not actionable, *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996)(prison officials do not violate the Eighth Amendment when, in exercising professional judgment, they refuse to implement inmate's requested course of treatment), there is nothing that establishes either Nurse McDonald or Dr. Mullins ever considered referring Nash for dental treatment for the periodontal disease. Nash has also alleged he was told he should wait until he got out of jail and then go to Oklahoma and have all his teeth pulled and get dentures. *Chance v. Armstrong*, 143 F.3d 698, 704 (2nd Cir. 1998)("Crucially,

-19-

he has also alleged that Dr. Moore and Dr. Murphy recommended extraction not on the basis of their medical views, but because of monetary incentives. This allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment.").

Similarly, with respect to his glasses, Nash has alleged that he needed the prescription eye glasses both for reading and distance vision. The eye glasses were confiscated and his requests to have them repaired or replaced or an eye examination to get another pair were not dealt with for several months. *Koehl v. Dalsheim*, 85 F.3d 86, 87-88 (2d Cir. 1996)(inmate's need for prescription eyeglasses constituted serious medical condition where, as a result of not having glasses, the inmate suffered headaches, his vision deteriorated, and he was impaired in his daily activities); *Weathrspoon v. Dallas County Medical Dept.*, No. 3:04-CV-1644-BF, 2006 WL 1234825, n. 7 (N.D. Texas May 9, 2006)("Whether a deprivation of eyeglasses constitutes deliberate indifference to serious medical needs depends on the facts and circumstances of the particular case and the degree of visual impairment suffered by the prisoner."). We therefore cannot say, when the evidence is viewed most favorably to Nash, that there are no genuine issues of material fact as to whether Nash's dental condition or need for glasses constituted a serious medical need. Furthermore, we believe there are genuine issues of material fact as to whether Nurse McDonald and Dr. Mullins were deliberately indifferent to Nash's serious medical needs.

### Interference with Mail

"Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). "The fact of

-20-

confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125, 97 S. Ct. 2532, 53 L. Ed. 2d 629 (1977).

"Prisoners' First Amendment rights encompass the right to be free from certain interference with mail correspondence." *Davis v. Norris*, 249 F.3d 800, 801 (8th Cir. 2001). "Interference with legal mail implicates a prison inmate's right to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). "A prison policy that obstructs privileged inmate mail can violate inmates' right of access to the courts." *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998).

Restrictions on this First Amendment right are valid "only if [they are (1)] reasonably related to legitimate penological interests,"such as security, order, or rehabilitation and are (2) no greater than necessary to the protection of the governmental interest involved. *Turner v. Safely*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). In balancing the competing interests, courts afford greater protection to legal mail than non-legal mail and greater protection to outgoing mail than to incoming mail. *See Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S. Ct. 1874, 1881-82, 104 L. Ed. 2d 459 (1989).

Here, Nash was allowed to send and receive personal and legal mail while he was at the BCDC. He complains only of one incident when he states legal mail left for him by his attorney was not delivered to him, two incidents when mail from his Father was returned, and one incident where a Christmas card sent by an unidentified individual was returned. Nash was confined at the BCDC from February 14, 2002, *resp.* at ¶ 1, until June 15, 2004, *resp.* at ¶ 3, he

-21-

points to only isolated incidents of alleged interference with his mail. He does not challenge any ongoing censorship. Nor does he challenge a ban on the type of mail a prisoner can receive or send. He does not contend he was denied paper, writing instruments, or postage.

He has not suggested there was any ongoing practice of censorship or that the application of any policy resulted in the alleged interference. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)(Plaintiff must show regular and unjustifiable interference-- an isolated incident of mail tampering is usually insufficient to establish a constitutional violation); *Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2000)(allegations of sporadic and short-term delays and disruptions are insufficient to state a claim under the First Amendment); *Rowe v. Shake*, 196 F.3d 778, 782-783 (7th Cir. 1999)(relatively short-term and sporadic delays in receiving mail not the result of content-based prison regulation or practice is insufficient to state a First Amendment claim). Furthermore, there is no indication the named defendants were responsible for the alleged interference. Defendants are therefore entitled to summary judgment on this claim.

### Law Library

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996); *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494-95, 52 L. Ed. 2d 72 (1977)). In *Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts. To state a claim that a law library or legal assistance program

AO72A
(Rev. 8/82)

violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims. Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) and *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

In this case, Nash's claim stemming from his lack of access, or limited access, to a law library or legal materiels fails because he has suffered no actual injury. Nash was able to file this civil rights action and has identified no deadlines he missed. *See Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic). Although "[p]ro se defendants have a right of access to adequate law libraries or adequate assistance from persons trained in the law," *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991)(quotations omitted), the right is not an abstract one and the inmate must "demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. Nash's allegations are insufficient as a matter of law.

-23-

# IV. CONCLUSION

I therefore recommend that the defendants' motion for summary judgment be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to the following: (1) the excessive force claim; (2) the denial of access to the law library claims; and (3) the interference with legal and personal mail claims. I further recommend dismissal of the following claims on the grounds that Nash failed to exhaust his administrative remedies: his claim that Fabian Rutherford used excessive force against him; and his claims that he was denied access to religious correspondence materials and religious materials left for him by his pastor. Finally, I recommend that the motion for summary judgment be denied on Nash's claim that he was denied adequate medical and dental care.

This would dismiss all claims against Sgt. Clifford, Fabian Rutherford, and James Crabtree.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 17th day of May 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

-24-